ADVANCE WHIP & NOVELTY CO. *v.* BENEVOLENT PROTECTIVE ORDER OF ELKS OF MONTPELIER.

November Term, 1933.

Present: POWERS, C. J., SLACK, MOULTON, THOMPSON, and GRAHAM, JJ.

Opinion filed January 4, 1934.

*H. C. Shurtleff* for the defendant.

*Powell & Powell* and *J. Ward Carver* (of counsel) for the plaintiff.

GRAHAM, J.   On July 17 to 19, 1930, one H. M. Knight, the owner of a circus, gave an exhibition of the circus at Montpelier in the name of the defendant.   The exhibition was advertised as the Elks' circus.   The contract between Knight and the defendant was not received in evidence, but witnesses testified that the arrangement was made with a so-called committee of the defendant, and that it provided for a division of the net profits between Knight and the defendant.   Joseph G. Abair was the Exalted Ruler of the defendant lodge, and also a member of the committee.

Just before coming to Montpelier, this circus was exhibited by Knight at St. Johnsbury under the auspices of the lodge of Elks there.   The plaintiff, a Massachusetts corporation, of Westfield, Mass., shipped to St. Johnsbury on consignment certain merchandise and games for use and disposal at that exposition. When the circus closed, the St. Johnsbury lodge was to return to the plaintiff at Westfield all unused merchandise and games for credit.   The games were not for sale, but were to be used in connection with the sale of the merchandise.

On July 16, Abair wired the plaintiff to release the novelties at St. Johnsbury and charge same to Montpelier Elks.   The plaintiff made no direct reply to this telegram.   The next morning its manager telephoned the chairman of the committee at St. Johnsbury and authorized him to assent to Abair's request.   The committee chairman immediately communicated with Abair by telephone.   He then engaged a truckman to deliver the goods to Montpelier, and they were brought by truck to the grounds then being occupied for the circus.   Abair paid the trucking charges.

The goods so delivered consisted of wheels and lay downs. bingo cards, and a fortune board; also an assortment of articles consisting of blankets, electric heaters, clocks, thermos bottles, coffee percolators, etc., to be used as prizes in connection with the wheels, punch board, and other games.   If any of the delivered articles were of a different classification, or for a different purpose, it is not indicated in the briefs, nor, so far as

we can discover, is any such separation made in the record. The conclusion is clear from the record that the plaintiff's goods were sent to Montpelier for the same intended use and on the same terms as prevailed at St. Johnsbury. The articles intended as prizes proved, on examination, unsatisfactory to Abair, and few, if any, of them were used or disposed of. The games, however, were operated with other prizes secured locally. At the close of the circus, Abair turned over to Knight the plaintiff's goods, and games with directions to return them to the plaintiff, but only a part of the games and merchandise was returned.

This action of contract is brought to recover the inventory value of the unreturned merchandise and games. The trial was by jury, with a verdict and judgment for the plaintiff. The case is for review on defendant's exceptions.

At the close of the evidence the defendant moved that a verdict in its favor be directed because (1) there is no evidence that the defendant was in any way bound by the acts of Abair in ordering or dealing with the goods in question, and because (2) the contract between the plaintiff and defendant, if there was such a contract, is so tainted with gaming or gambling as to be void. The same questions are raised by a motion to set the verdict aside.

Our view of the case requires a discussion only of the second ground of the motion, and, for the purposes of our discussion, we will assume, but do not decide, that Abair had authority to represent the defendant in the transaction.

That the games furnished by the plaintiff were devices for the disposal of merchandise by chance is not questioned. The wheels are numbered to correspond with numbers on the lay downs. The player chooses a number on the lay down and, after paying the required price for the privilege, places a token thereon. Then the wheel is turned and if it stops on a number corresponding with the number chosen on the lay down the player gets one of the prizes, otherwise he loses his money. The fortune board is about three feet square with numbers scattered over it in close alignment, and it is assembled with prizes. The player, after paying, draws a ticket on which is printed the player's fortune and also a number; if the number on the ticket corresponds with one of the numbered prizes, he wins it, otherwise the player gets only the printed fortune for the price paid.

The bingo cards were designed for the sale of articles by the chance drawing of numbers. A man, whose identity and connections were not disclosed, otherwise than that he was called "Zippy," assisted at the operation of the wheels. If the wheels became too generous with the prizes, his duty was to adjust or plug them so they would not stop on numbers selected by the players. It is common knowledge, of which we take judicial notice, that these so-called games are nothing but gambling devices furnished for gaming purposes at fairs, carnivals, and circuses, and it cannot be questioned, and is not in this case, that the keeping and using of such devices under the circumstances and for the purposes shown here in evidence was a violation of the criminal statutes of this State. G. L. 7079, 7090, and 7091.

On this phase of the case, the court submitted to the jury only the question whether the plaintiff knew that the goods were to be used for gambling. The defendant contends that this was error because the evidence, taken most favorably for the plaintiff, compels the conclusion that the plaintiff had such knowledge.

Some of the states follow the English rule that, where the agreement is innocent in itself, but the intention of one of the parties is unlawful, as where goods are bought or money borrowed to be used for an unlawful purpose, the mere fact that the other party knows of such purpose renders the agreement illegal and void. 13 C. J. 517, § 476; *Parker-Gordon Importing Co.* v. *Benakis,* 213 Iowa, 136, 238 N. W. 611. But the plaintiff contends that the rule in this State, as established by our cases, is that, in addition to mere knowledge of the buyer's illegal intention, the seller must do some act in aid of, or in furtherance of, the unlawful design. This rule was held to apply to legal sales in a foreign state of goods conveyed to this State by common carrier in the ordinary and usual course of business in *Case* v. *Riker,* 10 Vt. 482, 33 A. D. 211; *Gaylord* v. *Soragen,* 32 Vt. 110, 76 A. D. 154; and *Tuttle & Reed* v. *Holland,* 43 Vt. 542.

But in *Territt* v. *Bartlett,* 21 Vt. 184, 190, this Court, on the authority of *Lightfoot* v. *Tenant,* 1 B. & P. 551, recognized and approved the rule that one who sells goods, *in the place of the forum,* knowing they are intended to be put to an illegal use there, cannot recover the price. The decision of the case, however, was put upon the ground that the plaintiff having

solicited and received the order for liquor within the State, the the contract for all practical purposes was made within the State, and thereby the plaintiff participated, countenanced, and aided the illegal object of the defendant.

In *Aiken* v. *Blaisdell,* 41 Vt. 655, it was held that, if a seller of intoxicating liquor in New York, to a party in Vermont, intentionally aid the purchaser in evading the law of Vermont, by shipping the liquor in disguised form, calculated to accomplish the object, the seller cannot recover the price in this State, even though there was no agreement for such aid. See, also, *Gaylord* v. *Soragen, supra,* as to what constitutes in such circumstances sufficient participation to preclude recovery.

In *Mound* v. *Barker,* 71 Vt. 253, 44 Atl. 346, 76 A. S. R. 767, Judge Rowell states our rule as follows: ''When an agreement, innocent in itself, is designed by one of the parties to further a purpose forbidden by the law or opposed to its policy, courts will not enforce it in favor of such party, nor in favor of the other, if he is implicated in such design.''

With this statement of our rule, we come directly to the inquiry whether there is evidence of the quantity and character which entitled the plaintiff to go to the jury on the issue of its knowledge of and participation in the illegal purpose of the defendant.

The plaintiff manufactured the wheels; it prepared the fortune board and assembled its prizes ready for use; it had been in this business for twenty years, and during that time has been on the lookout for carnivals and fairs at which to use its games and dispose of its merchandise. As we have seen, the ordinary use, if not the only use, of these games and the articles furnished with them and forming an integral part of them was for gaming purposes. The plaintiff will be deemed to know and intend when it sends them out that they will be appropriated to their ordinary use. *Spurgeon* v. *McElwain,* 6 Ohio, 442, 27 A. D. 266.

The plaintiff's manager testified that he did not know what these games were used for at Montpelier because he did not see them used there; that no matter what ideas he might have, he had no positive knowledge. This denial of knowledge, if such it may be considered, is not evidence of such quantity and character, in view of the convincing evidence to the contrary, as will support a finding of lack of knowledge. See

*Widham* v. *Town of Brattleboro,* 105 Vt. 210, 166 Atl. 22. Certainly fair-minded men could reach but one conclusion from the admitted facts that the plaintiff manufactured the wheels, constructed the fortune board, assembled the prizes for the latter, and had been sending out these games for use on the public at carnivals and fairs for twenty years.

■■ But the decision need not rest upon this construction of the evidence. This property of the plaintiff was, at the time Abair sent his telegram, within this State. It was then being used, or had just been used, at St. Johnsbury for gambling purposes contrary to the laws of this State. The reply to the telegram did not come directly from plaintiff's manager, who was in Westfield, Massachusetts, but rather from the Elks chairman of St. Johnsbury who was specially authorized to represent the plaintiff in granting assent to Abair's request for release of the goods to Abair for use at the Montpelier circus. The St. Johnsbury chairman knew that this merchandise had been used at St. Johnsbury for gaming purposes, and it was transferred to Montpelier for the same uses and purposes. This knowledge and the illegal design are, in the circumstances, imputed to the plaintiff. The facts clearly establish that the contract was entered into in this State. The offer was made in Vermont. The last act necessary to complete the contract was performed here. That is determinative of the place of contract. Restatement, Contracts § 74; 13 C. J. 581, 582.

■ The plaintiff, therefore, under the rule of our cases, was implicated in the design of the defendant, and has so far participated in the illegal enterprise by aiding, abetting, and assisting in carrying out the defendant's purpose to violate our laws that it is disqualified, as matter of law, from maintaining this action.

Lord Mansfield in *Holman* v. *Johnson,* Cowper, 343, said: "No court will lend its aid to a man who founds his cause of action upon an immoral or illegal act. If from the plaintiff's own statement, or otherwise, the cause of action appears to arise *exturpi causa,* or by the transgression of the positive law of the country, then the court says he has no right to be assisted. It is upon that ground the court goes, not for the sake of the defendant, but because they will not lend their aid to such a plaintiff." See *Sowles* v. *Welden Nat'l Bank,* 61 Vt. 375, 377, 17 Atl. 791.

*Canfield Manufacturing Co.* v. *Paddock*, 96 Vt. 41, 116 Atl. 115, is not an authority for the plaintiff. It is easily distinguished. Neither party in that case claimed that the contract between the plaintiff and defendant was illegal, or that the plaintiff was connected with illegal sales by the defendant. The case holds that where goods were forwarded by the owner to be sold on commission, the money received by the consignee from the sale of such goods, in excess of his commission, though it was received upon an illegal contract, was the plaintiff's money, held in a fiduciary capacity, which the defendant had no right to appropriate to his own use. The language of the opinion is to be read in connection with the facts of that case, and is not to be extended to apply to a situation presented by this record.

The plaintiff says in his brief that it "can recover on the basis of the conversion of his property." But it is not indicated how such a recovery can be had, on the evidence, in this action of contract.

We hold that the defendant's motion for a directed verdict should have been granted. This determines the case; so other exceptions briefed need not be considered.

*Judgment reversed, and judgment for the defendant to recover its costs.*